Good morning, Your Honors. May it please the Court, my name is Logan Johnston, and I represent the appellants, the Arizona State Healthcare Cost Containment System, and its director, who is now Anthony Rogers. I would like, if possible, to reserve five minutes for rebuttal, and I apologize to the Court for the typos in my briefs. I hate those, and I'm sure you do too. The plaintiff's theory in this case has been, and quoting from page 2 of their response brief, the defendants deprive people of home care services that they need to remain living in the community. Your Honors, this is simply not true, and it never has been. The State of Arizona wants this home and community-based services program to succeed. It's what the members want. It's in the State's financial interest. It's a program that's grown tremendously over the years, and the evidence at trial was that the latest survey of the members was that they were highly satisfied. So the district judge issued an injunction. It's lasting a couple of years to run. It basically requires you to just do it right. So what's the problem? The problem, Your Honor, is that this particular judge sees the case in a very lopsided fashion, with all due respect. He categorically rejects anything that is positive stated about the program in post-trial hearings. He absolutely believes any anecdote that is adverse to the State, and he refuses to give us an evidentiary hearing on these matters. And then he suggests that he's going to impose substantial financial sanctions on us, along the lines of Judge Collins in the Tucson case from Arizona, where a million dollars a day was entered as a sanction. I respectfully submit that we should not have to live under that tension. If the judge wanted to give us a hearing and hear these matters out and see if any sanctions were appropriate, that would be one thing, but he just refuses to do that, and repeatedly so. I'm sorry. We had a long trial, and that's what we're reviewing. So what's the hearing that you didn't have? Oh, a hearing would be on the anecdotal evidence that the plaintiffs have provided since the trial. I see. To support the suggestion that they – That's not this appeal. No. But you asked what the problem is, Your Honor, and that's the problem. The judge continually threatens us with sanctions, and I think if the injunction is not vacated, he will probably enter some sanctions that will cause us to come back here. This makes it rather difficult for us. This is just outside the record telling us what your current problems are, but it's not brought to us in any way that we can deal with it, as far as I can see. And, Your Honor, I did not intend to get into that area as part of my argument today. My argument today is the injunction should not have been entered, and it should be vacated by this panel. The primary reason, the sole reason that was discussed at any length, in any detail by Judge Carroll, was that the State had violated the so-called equal access provision of the Medicaid statutes. That's 1396A. Well, I think we can agree with you that Judge O'Scanlan's opinion makes it clear that there isn't a private right of action for that. But there are other provisions in the statute. One of them Judge Carroll dealt with and found a violation of the – I guess it's the free choice provision. So I think maybe you should turn your attention to that. Thank you, Judge Fletcher. That's exactly what I intended to do. And on the first of the other statutes that the plaintiffs claimed was a basis for the decision, that was the Americans with Disabilities Act. But the one that's in the opinion is the freedom of choice provision, so maybe we ought to start there. Okay. Because it made a holding on findings with regard to that. They may have been short, but they're there. Sure. The freedom of choice statute, Your Honor, compels the State to do two things. One, create a choice for members when there is a home and community-based service program, so that they are allowed to choose to get services under that program as opposed to being institutionalized in a nursing facility. That's the first thing that statute requires. The second thing is that the State give notice of that choice to people so that they can make the choice. And there's a fair amount of case law interpreting that to mean that if the home-based choice is an unworkable one, then there really isn't a choice. That's correct, Your Honor. There are a couple of cases. That's the issue here, and that's the finding, as I understand it. All right. And what I would say to that concern, Your Honor, is that there was no evidence here that people were not given the choice between nursing care and home and community-based services. But there was evidence that if they chose a home and community-based services, they were often left without those services, that there was a major gap in the services at different times, and that, therefore, people, the implication was that at least one person did choose or have to go into the nursing home because the home-based care was really not meeting the recognized needs. That's the issue. And the question is, is there evidence to support that conclusion? And the evidence I would suggest, Your Honor. Let's assume the theory. Are you contesting the theory? Are you saying that that's not a legal, a viable legal theory? I'm suggesting there's no case that I know of, Judge Berzon, that says — Berzon, B-E-R-Z-O-N, yes. My apologies. That says that gaps in services are the equivalent of a lack of freedom of choice. I know of no such case. There's no case that says that if the home healthcare service, without using the word gaps, doesn't meet the needs, the recognized needs, then there really isn't a choice. There are lots of cases saying that, right? There may be cases, Your Honor, saying where there is — Not in our court, I don't think, but there are cases. I'm familiar, Your Honor, with cases that stand for the general proposition that if there is no program or if it's denied in terms of access to the members, that that is not a choice. I know of no case that gets down to the provision of medical care and says, for instance, if you don't provide services 10 percent of the time on schedule, that that is the equivalent of not allowing people a choice between nursing care and home and community-based services. What I'm suggesting, Your Honor, is that we are providing home and community-based services, by definition, to this very class. They are getting the services. The question in this case is whether not getting the services always on schedule amounts to a lack of choice. There isn't anybody who — The problem, of course, is that these are not voluntary services. These are services for people who, if they don't have the services, can't eat, can't go to the bathroom, can't get washed and can't get out of bed. So if they don't get them, they're basically, even for one day out of five, it's not like they're not getting something that's just desirable. They're not getting something that's necessary. I agree. And that is what the district courts seem quite concerned about. And I agree, Your Honor. There's no question it is a hardship when people do not get such services. I have two preliminary questions. Are you conceding that there's a private cause of action under the free choice provision? I'm not conceding it, Your Honor. I'm just simply here saying I never briefed that issue. I think it's a little late for me to bring it up now. Well, it was certainly in the findings of the judge. With respect to the equal access provision? Well, he made the finding in respect to freedom of choice. Well, it's my understanding from reading the cases, and this is why I did not bring the issue up before, that there is. If there's some question about it, I just meant to say I'm not concerned. And secondly, that a State must provide a non-institutional alternative. I think that's an optional program, Your Honor, under Medicaid. We have chosen to exercise that option, so now we have that obligation. Okay. But back to your question, Judge Berzant. The evidence in this trial was that one person for a length of time of 10 days in 1999, four years before the trial, had gone into an institution because her companion and caregiver was unavailable because she was sick that particular stretch of time. And it was unclear in the record as to whether or not that person was seeking to get institutional care because of the extra services that that person provided that were now unavailable because the person was sick. But that's the only evidence, Your Honor, of anyone going into a nursing facility for any length of time, let alone being forced to choose that as a way of life as opposed to living in a community. But apparently there were. My understanding of the record shows that when people raised the problem of these gaps existing, they'd say, well, it's your choice because you could have gone to a nursing home. Well, that is the way that the judge chose to characterize the evidence, Your Honor. That's not what people said. That's not a viable position for any state to take, and it's not the one Arizona takes. What we said and what the witnesses said simply was there is a difference between getting 24-hour, around-the-clock care in a facility where you know someone is there designed to meet your needs and living at home. The attendant care services that the state provides are not around-the-clock. Therefore, there is some period of time when you're in your home without an attendant care person there to help you. That's all they were saying. There is that natural distinction. So there is some risk that people have to be aware of that they are running, when they choose to live at home, without the 24-hour care. That's the only point anybody ever made. There is no evidence of any written policy, any testimony by anybody suggesting that the state of Arizona adopts this program and then takes the cavalier attitude with everybody. Well, this is an option, but understand, we may or may not choose to do anything for you, and you're really assuming a big risk. We have no incentive to do that. It's much cheaper for us to provide this care in the person's home than in a nursing facility. If we were to think that there was sufficient evidence as a matter of liability on the freedom of care issue, what about the injunction? Would we have to remand to redo the injunction because it's on a different theory? If you were to find that there's some violation of the freedom of choice statute, Your Honor, I suggest that the injunction was not designed to take care of that problem at all and goes much further than is necessary to achieve the purposes of that particular Medicaid statute, the freedom of choice. What about the ADA? On there, that's a sort of a middle ground cause of action, as I understand it, because that did go to trial, but there's nothing in the findings. That's right. There's absolutely no discussion of the ADA, either in the findings or the conclusions, by Judge Carroll. And I read that to mean that he was saying he could not find a violation of that act. Otherwise, given the vehemence with which he wrote the rest of the opinion, I don't think he'd have left it. Well, I could have just been saying it was redundant, and if it's no longer redundant. I mean, it could have been redundant at that juncture because of the freedom of access, because of the equal access. There's a very strong overlap because there's no point. It doesn't matter. Well, respectfully, Your Honor, I don't think there is a lot of overlap between the equal access and the ADA. Let me ask this. Is there anything in the injunction that you don't think is your obligation? Yes, Your Honor. And what would those things be? The idea that we should guarantee the provision of services within two hours. It's a fine goal, and we can aspire to it, but to guarantee it on pain of sanctions from Judge Carroll is not something that we should have to live with. And it's premised solely on the proposition that the equal access statute was violated, the idea being to prevent or remedy a shortage of workers that was caused by the payment rates that the state pays. It has nothing to do with the ADA or the freedom of choice statutes. It's simply not designed for that purpose. And so, Your Honor, to answer your question, yes, I think the case would have to be remanded to Judge Carroll to fashion a new injunction if, in fact, that's what he was trying to remedy and if, in fact, that's what we're trying to remedy. Do you agree that you have to pay a wage that will attract enough people to provide the service? Absolutely. Isn't that what he's saying in that wage part? Yes, Your Honor. He's addressing the equal access provision under the Medicaid statute. So that provision, you would say, has to go? Is that it? No, I'm not saying that has to go. I'm saying, well, it should go as a matter of law, Your Honor, because there's no standing for that provision to be challenged by these plaintiffs. Therefore, to the extent that's the case. The question is, could he impose it under a free choice theory? I don't believe he could, Your Honor, because that statute goes to very simple, general concepts, not to the kind of micromanagement that Judge Carroll is attempting. Just for a moment, to go back to the equal access issue. You referred to that issue as one of standing. It's not one of standing. It's one of whether there's a private cause of action. Is that waivable? You know it's waivable because you said you waived it in the other instance. So I'm slightly concerned about why it is that you didn't also waive the private cause of action question with regard to the equal access. Did you ever raise that anywhere? No, Your Honor, we did not. So why didn't you waive it? I don't believe it is waivable. Why not? You just told me it was waivable under freedom of choice. Why isn't it waivable? I'm sorry, Your Honor. I'm not following. You said, I believe correctly, that it was too late for you to raise the question of whether there's a private cause of action under the freedom of choice provision. Thereby recognizing that the question of whether there's a private cause of action or a cause of action under 1983 is not a jurisdictional question or one of standing. All right. So therefore, why didn't you also waive it with regard to the equal access provision? I don't believe it can be waived, Your Honor. I don't mean to say that I knowingly waived it with respect to the other argument. What I thought I was trying to say was to the extent there's some question about whether there's jurisdiction there. Well, there is case law that says that the issue of whether there's a private cause of action is simply a cause of action question and not a jurisdictional one. Why is it jurisdictional? The cases I cited in my reply brief, Your Honor, are the ones I would rely upon. They don't say anything about it being jurisdictional as far as I know. Well, I believe, Your Honor, our argument is that Sanchez v. Johnson says there's no standing for the plaintiffs to. It doesn't say there's no standing. It says there's no cause of action. Okay. All right. There's no cause of action. But that's different from staying. They came in. If they alleged a cause of action, like anybody else alleges a cause of action, and we say to them, well, fine, you know what? There is no cause of action. You lose. But why is that a standing or jurisdictional question? I'll simply have to rely on the cases I cited, Your Honor. I'd like to reserve the rest of my time. Thank you. Good morning, Your Honors, and may it please the Court. I am Sarah Locke with AARP Foundation Litigation, and with me at council table are Sally Hart and Jennifer Nye of the Arizona Center for Disability Law. We represent the plaintiff at police in this case, elderly and disabled people, who are being charged with a criminal offense. Who have been or will be eligible for Medicaid long-term care services, known as HCBS. Medical eligibility standard, as Judge Carroll found, is that these people are at risk of institutionalization. For example, the named lead plaintiff, Peg Ball, is in a wheelchair. She's quadriplegic. She's dependent on a ventilator at night. She needs an attendant care worker to provide her total assistance with activities of daily living. Colin Phelan is a child with traumatic brain injury who is also a quadriplegic. Venetta Graham is an elderly woman living in Tucson. She has leaking brain fluid, seizures, tremors, and is blind in the right eye, and she lives with her mentally disabled son, 45 years old. Grace Collier could not turn in bed, transfer from bed to the toilet, change her diaper, or dress without an attendant care worker to help her. These are just some of the plaintiffs in the class. All of these plaintiffs suffered needlessly when no one showed up to help them with these most fundamental health care services. And the record is replete with a testimony of the plaintiffs who testified as to the trauma and the indignities they suffered as they tried to cope to remain in their home without these services. The trial judge in this case heard the testimony and read the voluminous documentary evidence and found defendants violated Federal law for their failure to assure that these services were provided. The bulk of the defendant's argument in this case is an attack on that the facts were not sufficient to establish liability. The standard of review, as you know, however, is a highly deferential one. Can we go to the question of, first of all, I gather you now agree that there is no cause of action of the equal access case. That's right, Your Honor. And you don't think the question was waived. Your Honor, frankly, I hadn't considered that until the panel was discussing it. I would say that certainly in this case you could make a very strong argument that it was waived because it was never raised below. And, in fact, it was never raised to this Court until in reply after Sanchez was handed down. Although the district court did decide. Yes. Judge Carroll made a specific finding that he found it enforceable. So it certainly was at issue at the time of the appeal. All right. And what about the, I noticed that your supplemental brief doesn't address the freedom of choice issue at all. Is there a reason for that? Yes, Your Honor. Given the blow that Sanchez dealt this, this, the equal access provision, we decided to look at where we thought the Medicaid provisions were most strongly and clearly a private right of action was available. As I know, every court, but one that's looked at the freedom of choice issue has found that even after Doe and so on, that there is an individual cause of action because the language is quite different. That's right. Many of those cases were from other circuits. We thought that the reasonable promptness provision, even under Sanchez. But the reasonable promptness provision you've really got a problem with because it didn't go to trial. It was dismissed on summary judgment. And you could have appealed the summary judgment, but I don't see how you can appeal it on the trial record. You could have appealed the denial of summary judgment. You didn't do that. No, Your Honor. It's quite clear under Massachusetts Mutual v. Ludwig that an appellee can urge any record, any matter in the record below in support of the decree. A case that didn't, an issue that didn't go to trial? I mean, that's completely unfair to the defendant. They had no reason to try that case. They were told it wasn't going to trial. You could have appealed the summary judgment, but you can't appeal on the trial record something that didn't go to trial. Well, that was the choice that we made, not to make an interlocutory appeal. No, but you could have appealed it now. You could have appealed now the denial of summary judgment on the summary judgment record, but I don't see how you could appeal the trial. Well, that's right. That would require a cross appeal, but that's not necessary under Massachusetts Mutual. Do you know any case in which a case that was dismissed before trial was upheld on the basis of the trial? I can tell you that the cases that I've reviewed, and I have provided a supplementary citation to Cigna v. Polaris Pictures, which deals with the appellate court finding a totally different issue. It was a contract violation, and the court below found on the contract could be rescinded because of fraud. But the court of appeals said that issue, we're not going to rule on that issue. We're going to rule on the fact that information wasn't disclosed in the beginning of the contract. And if my memory serves me correctly, I believe that was on the trial record. Yes, but I assume it was a case that wasn't dismissed before trial, an issue that wasn't a cause of action that wasn't dismissed before the trial. I would have to look again to say that. But I would recommend the other cases cited in a brief for that proposition. Can I just ask the, when I ask the other side, assuming we uphold the liability on the free access, wouldn't we still have to remand to fashion a new injunction because it seemed a lot of the relief that was granted here was based on the equal access? Your Honor, the fundamental principle of Judge Carroll's order was to provide the services. And whether you do it under a freedom of choice analysis or reasonable promptness, the order says these are the steps which you must take to comply and make sure services are provided. I think the way you're doing it, you're equating the, what you might call the substantive provisions of equal access. And you're in effect saying free choice is exactly the same. Well, Your Honor, there are. I think it is. Well, there are many cases that say that freedom of choice is not guaranteed if the rates are so low that they're not freely available. So there are cases cited in our brief that discuss the correlation of payment to making services freely available. And the same can be said of the reasonable promptness claims where courts have said that if it's not, if it's underfunded or not reliably provided, it's providing no choice at all. I would like to ask, it's been two or three years now since the injunction went into effect. Is there any reason to think the State is not complying with those terms? Yes, Your Honor, there is, because we have filed enforcement motions. We have numerous plaintiffs that have come forward complaining of still not receiving the services. Okay. I don't want to get off the record on this one, so you've given me the information I need. Okay. I would like to clarify a point on the ADA. It is true, of course, that Judge Carroll did not cite to the ADA. But if you look at his rulings, you will see that he found violations of each element of the ADA. He found that the individuals have a disability and are qualified to receive services, findings of fact two, four, and five. He found that the defendant is a public entity which receives federal funding to ensure services to Arizona's Medicaid clients, finding of fact number one. And finally, he found that the individuals, although he did not use discriminated against, he found that they were. This is established because Judge Carroll found that plaintiffs have been denied freedom of choice of receiving adequate services at home, conclusion of law 18 and 19. Instead, as Judge Carroll found, it is the policy of access that plaintiffs must bear the risk of choosing to remain at home rather than to be in an institution that the services he or she needs will not be delivered, finding of fact number 61. It is discrimination as a matter of law under the Supreme Court's mandate in Olmstead, under the integration mandate, and as this Court found in Townsend v. Quasim, that when a disabled person cannot get, cannot choose to get the services they need at home rather than an institution, the ADA is violated. Kagan. There was a post-Townsend v. Quasim case which, as I recall, stated that the, and I don't know the case offhand right now, but stated that when the State is operating under one of these waiver provisions, that not, well, maybe it was different. I guess not having more slots was not necessarily a problem. But here the problem isn't a slot problem. No, not at all. What they're providing to the people that they purport to be providing services to. That's right. That's right. And I see that I have a few moments, and I, if the Court would like to hear this, I can go through the record and point out those instances where, contrary to Plaintiff's Counsel's statements, that, in fact, people were institutionalized as a result of not receiving these services. Well, it would be useful. I know that, I know about Ms. Ball, but I don't recall there were any others. Okay. Grace Collier was moved to a nursing home after this lawsuit was filed, where she died in January 2001. That's in the supplemental ER, the proposed joint pretrial order. My suggestion is that was because she was just sort of terminal. There's nothing in the record to support that. Right. Judith Hinton was threatened. Her testimony discusses how she was told because she couldn't get any services, she had to go into a nursing home. And she testified with great eloquence what she did to keep herself out, that she suffered many indignities to avoid going into an institution. I would also point out the two executive directors of the independent living centers, one in Phoenix and one in Tucson. This is the bulk. Those two areas are the bulk of where most of the HCBS recipients live. Their expertise is placing people out of institutions and providing, getting care for them in their homes. They both testified that services were not reliably provided and, therefore, people couldn't get out of institutions. There was documentary evidence relating to the Gila River Indian tribe saying because services weren't provided, people were in institutions. Now, is there a case law under either the ADA or the Freedom of Choice provision recognizing that the cause of action includes sort of bad care as opposed to no care? No, Your Honor. I'm not familiar with any of those cases. But I have to say that this is an instance of no care. It's really not bad care. They're not getting the services that are prescribed in their care plans. These are services that the State and their program contractors acknowledge are medically necessary. So you would say the difference is between if somebody is supposed to have an attendant 40 hours a week and they have a 20 hours a week, they have 20 hours of no care, whereas if they had a bad attendant for 20 hours, that would be bad care. That's right. And the problem here is no care for some period of time. That's exactly right. And the record is replete with, for example, Ms. Ball testified that she estimated she went without care, scheduled care for 3,000 hours. I mean, there are many instances of people. Colin Phelan went without care at all from he was authorized for care in July 1998. He got no services until February 2000. Now, let's turn to the violation of the reasonable promptness requirements of the Medicaid statute and the regulations for a moment. 1396AA8. But that was the one that was dismissed before trial. That is correct, Your Honor. And I would just say that these cases all discuss that the cases that I cited to you before in Cigna and MassMutual all say that the court of appeals can affirm on any legal basis found in the record. And certainly reasonable promptness was argued. But is that legal basis found in the record, that a case that didn't go to trial when there was a trial? That's correct. But Judge Carroll I mean, suppose you were to show up with something that you never put in the complaint either. Well, that's not the case. I mean, it was in the complaint. But it's the equivalent. It is the equivalent because this did not go to trial. Well, the reason that I think that it's not completely equivalent is because Judge Carroll took over this case approximately two or three weeks before trial was set. Judge Marquez handled it before. Judge Carroll felt bound by Judge Marquez's ruling. And throughout the trial, he expressed his frustration about those limitations. And if you look at Judge Carroll's order, you see that he has actually come up with a definition of reasonable promptness. And his findings Well, it may not have been the law of the case, and he may have been able to make a finding, but he didn't do it. That's true. I'm sure you didn't mean it, but in looking at your supplemental brief, I was struck a little bit by the fact that you didn't really argue about the that the Sanchez case would not control the free access, fair access, and the fair choice. Can you tell me why? Certainly, Your Honor. We looked at the principles of stare decisis and looked and thought that there are other circuits who are developing contrary opinions. And we thought that that would be a very good basis to argue that Sanchez was wrongly decided. Obviously, we believe that it was. But we thought that that was a very difficult principle to overcome. And we thought that the reasonable promptness claim was much cleaner and clearer. There's another problem with the reasonable promptness claim, as I understand it, which is that the government's argument, which seems fairly persuasive, is that the ‑‑ that that is a ‑‑ that provision doesn't deal with the question of whether or not you're going to get discrete services reasonably promptly, but whether you're going to get into the system and become essentially a beneficiary of the system reasonably promptly. And that, in fact, is why Judge Marquez dismissed the reasonable promptness claim. He thought that that was limited to initiation of services. That was a legal issue and you never appealed it. Well, we believed it wasn't necessary under the precedent. But we have a very simple answer to that. It does apply. We moved for reconsideration at the time, just to let you know, of that order, and Judge Marquez denied it. But if you look at the structure of the statute itself, it has two clauses. One deals with the initiation and the second deals with continuing services. If Congress had meant to limit the second clause to only initiation of services, they wouldn't have used the word furnished. What subsection is that? 42 U.S.C. 1396A sub 8. It says that the first clause reads, provide that all the state must provide that all individuals wishing to make an application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals. I read that, as does the Center for Medicare and Medicaid Services, the federal agency interpreting it to mean continuation of services. If you take the regulation, which is often used to elucidate the meaning of the reasonable promptness statute, 42 CFR 435.930, you will see that that provision is divided into three subsections. The first says that the agency must furnish Medicaid promptly to recipients without any delay. The subsection B says continue to furnish Medicaid regularly to all eligible individuals until they are found ineligible, and that they must make arrangements to assist applicants and recipients to get emergency medical care whenever needed, 24 hours a day and on a seven-day basis. Of course, the federal agency responsible for implementation of the Medicaid program provides very persuasive regulations in this area to show that, of course, the agency must continue to provide services promptly. And I would say that if you look at the entire structure of 1396A, you see that there are 58 different subprovisions, which Congress has said the states must comply with. It would make no sense, given the extensive regulation that Congress put on states, that they would say you must provide services in the beginning, but especially with reference to long-term care services that are given over a long period of time, that you don't have to provide them reasonably promptly either. In many cases, support the notion that it must be provided regularly. I see that I have 13 seconds. Kagan. No seconds, because your time is up, but I will give you half a minute. Go ahead. Okay. I just want to say that the final irony in this case is that ACCESS has already paid for these services. It's a managed care program. The capitated payment that is given to the program contractors, the program contractors have assured ACCESS they're going to provide all the necessary services, but they haven't. We ask that the Court affirm the decree. Thank you very much. Thank you very much, Counsel. Counsel. In rebuttal, Judge, I would simply cite you on the standing point to the case of Debbie Reynolds' casino, which we cited in our supplemental brief. I think that's very similar to our situation here. With respect to the freedom of choice argument that you've just heard, you heard plaintiff's counsel characterize this as a case of no care versus bad care in answer to your question. And I submit to you, Your Honors, you will not find a record made in this trial to support the fact or the allegation that we are not providing home and community-based services. The issue is between bad care and no care, and the facts of this case are one of bad care and for a very few people. And I do not believe that the record will support an injunction. However modified on remand, I don't believe it should be remanded. On that ground, freedom of choice. I think what we have here is no evidence whatsoever of a person having to even contemplate a choice between nursing care and home care except Ms. Hinton, I'm sorry, Ms. Ball, for that 10-day period. If the plaintiffs had had such evidence, they certainly would have highlighted it. Judge Carroll certainly would have remarked about it in his opinion. And I simply reiterate, Your Honors, this is a case that was decided on another ground. The Equal Access Statute, it wasn't decided on another ground. That's clearly not so. I mean, Judge Carroll said he was deciding it on this ground. He said he was. He says in, I think it's conclusion number 18. Several times he mentions it, more than once. He says there's a duty on the part of the State to provide freedom of choice. And then in one sentence at the very end of the last conclusion, he says, among other things, we haven't provided it without any discussion. If that's sufficient for an injunction on this case on that ground. Well, it's certainly sufficient for a liability finding. He found a liability. He could be wrong, but he found it. And I would submit he's clearly wrong, Your Honor. If that's the evidentiary predicate for this case to have an injunction on that particular statute, I think it's clear error. And I'll leave it at that. Thank you, Judge. We'll take a 10-minute break and be back shortly.
judges: B. Fletcher, Berzon, Trager